ORIGINAL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FILED
MAR 7 2008
U.S. COURT OF
FEDERAL CLAIMS

| | |
|---|---|
| SAUDI LOGISTICS AND TECHNICAL SUPPORT,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)  CASE NO. 08-142 C<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT

Plaintiff Saudi Logistics and Technical Support ("SALTS") brings this civil action for relief from a final decision of a Contract Officer pertaining to U.S. Army Aviation and Missile Command ("AMCOM") Contract DAAH01-96-G-001, D.O. 0004.

## JURISDICTION

1.  Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. § 1491(a). Plaintiff brings this action pursuant to the Contract Disputes Act of 1978, 41 U.S.C. § 601, et seq.

## THE PARTIES

2.  Plaintiff SALTS is a sole proprietorship under the laws of the Kingdom of Saudi Arabia.

3.  Defendant is the United States of America ("United States" or "Government"), acting by and through the Department of the Army ("Army"), and its officers, employees, and agents.

## BACKGROUND
## (FIRST BUY)

4. In 1995, SALTS and the United States, through the U.S. Army Aviation and Missile Command ("AMCOM"), entered into Basic Ordering Agreement DAAH01-96-G-0001 to supply and/or provide services as determined by delivery orders, covering and involving a statement of work that includes providing services as defined in Section C-1 Statement of Work in support of the Kingdom of Saudi Arabia ("KSA") The Royal Saudi Air Defense Forces ("RSADF") patriot missile program.

5. The RSADF needed Prime Power Sets (Generators) to support the Patriot Missile systems being acquired on behalf of Saudi Arabia.

6. AMCOM requested a proposal from SALTS to purchase generators for this purpose.

7. AMCOM directed SALTS to purchase generators, spares, repair parts, and ancillary items for generator sets as manufactured by Lechmotoren G.m.b.H ("Lechmotoren") procured under Foreign Military Sales (FMS) case SR-B-JBV. Lechmotoren is a German company whose principal place of business is located in Germany, at which the Generators involved here were produced.

8. SALTS solicited a proposal to provide the desired generators from Lechmotoren. In correspondence dated October 11, 1996, Lechmotoren provided a firm, fixed-price proposal to SALTS, which stated, in part: "Above-mentioned prices are based on an exchange rate: 1 US-$ = 1.50 DM. The final exchange rate will be determined on the date of contract award and after opening of Irrevocable Letter of Credit (with our bank: Deutsche Bank, Munich). The risk for the exchange rate is then taken by Lechmotoren."

9. To enable compliance with its disclosure requirements and to attempt to ensure that it was receiving appropriate pricing from Lechmotoren, SALTS sought detailed pricing data directly from Lechmotoren. Lechmotoren refused to provide this information, claiming the requested information was proprietary and competition sensitive. SALTS informed AMCOM of its inability to obtain this information and sought AMCOM's assistance. In correspondence dated October 11, 1996, Lechmotoren in its firm, fixed-price proposal states in part "No cost details (price supporting data) concerning Lechmotoren's rates and factors will be provided to SALTS. Such information is considered to be proprietary to Lechmotoren company and as such is not releasable. However, this information will be made available to the BWB for evaluation."

10. On or about December 24, 1996, the Parties entered into an undefinitized contract, with issuance of Delivery Order No. 0001 under Basic Ordering Agreement DAAH01-96-G-0001 in which SALTS provided generators to the RSADF that SALTS acquired from Lechmotoren. A definitized firm, fixed-price agreement had to be negotiated by the Parties after performance had already begun.

11. SALTS sent a letter dated December 25, 1996, to the Army Contracting Officer listing the following subject: "Request for Audit of Lechmotoren GmbH Firm Fixed Price Proposal For Patriot Prime Power & Cost or Pricing Support Data."

12. The December 25, 1996, letter states, in part, "As you can see from the attached correspondence, Lechmotoren refused to provide any cost or pricing data, stating that Lechmotoren will provide the data only directly to the Bundesamt fur Wehrtechnik, Koblenz auditors" ("BWB"). BWB is an auditing agency of the German Ministry of Defense which has been selected by the United States Government to perform audits of German companies for such purposes in the past and to report the results of such audits to the United States Government

agency seeking the information in question, in this case AMCOM. It is normal practice for the BWB to perform such audits for the United States Government.

13. One of the attachments to the December 25, 1996, SALTS letter was the Lechmotoren proposal referred to above.

14. Following the conclusion of the audit of Lechmotoren, AMCOM and the contracting officer received the results of the audit from BWB and utilized them in connection with the price negotiations with SALTS. SALTS requested, but was denied access to, the audit and its results.

15. On or about June 12, 1997, Mr. Gregory Wilson of the AMCOM Acquisition Center sent a facsimile to SALTS stating, in part, that "our [the Government's] position questioned the additional profit, inflation surcharge, and cost currency hedging Lechmotoren charged in its proposal." (emphasis supplied).

16. On or about June 17, 1997, Mr. Troy Vesper of SALTS responded to Mr. Gregory Wilson's June 12, 1997 facsimile commenting, in part, about the currency rate issue and expressing SALTS readiness to discuss the issues and its proposal.

17. SALTS successfully performed all aspects of the provision of the generators involved in the first transaction and was paid, as required, in U.S. Dollars. No questions have been raised by the Government with respect to this transaction.

18. The RSADF was satisfied with the Lechmotoren generators provided by SALTS in connection with the first transaction and expressed an interest to AMCOM to acquire additional generators. AMCOM, in turn, contacted SALTS to pursue a potential acquisition of additional generators.

## BACKGROUND
## (SECOND BUY)

19. After receiving communications from the Government concerning an additional acquisition, SALTS contacted Lechmotoren by letter dated September 1, 1997 and solicited a firm, fixed-price proposal to provide additional generators. On or about September 4, 1997 Lechmotoren submitted to SALTS a firm, fixed-price proposal to provide the specified generators. In the body of the proposal, after specifying the price for which it would supply the requested generators, the proposal stated, in part: "Above-mentioned prices are based on an exchange rate 1 US - $ = 1.50 DM. The final exchange rate will be determined on the date of contract award." The quoted language was repeated in all subsequent proposals referred to below and placed in the final agreement between SALTS and Lechmotoren.

20. On or about September 10, 1997, SALTS submitted a Rough Order of Magnitude (ROM) proposal to AMCOM for the "Royal Saudi Air Defense Forces PATRIOT Prime Power Sets" based on the Lechmotoren proposal referenced above.

21. On March 31, 1998, an AMCOM Contracting Officer, James W. Graves, requested SALTS to submit a Not-to-Exceed ("NTE") Price for the "Royal Saudi Air Defense Forces PATRIOT Prime Power Sets (Buy 2).

22. On or about April 14, 1998, Lechmotoren submitted to SALTS a firm, fixed-price proposal to provide the specified generators. In the body of the proposal, after specifying the price for which it would supply the requested generators, the proposal contained the same qualifying language as quoted above stating that the final exchange rate will be determined on the date of the contract award.

23. On or about April 27, 1998, SALTS submitted a Not-to-Exceed proposal to AMCOM for the "Royal Saudi Air Defense Forces PATRIOT Prime Power Sets" based on the Lechmotoren fixed price proposal referenced immediately above.

24. In a letter dated December 2, 1998, AMCOM Contracting Officer, James Graves, requested SALTS to submit another not-to-exceed price for the "Royal Saudi Air Defense Forces PATRIOT Prime Power Set (Buy 2)."

25. On or about December 16, 1998, Lechmotoren submitted to SALTS a firm, fixed-price proposal, including the same basic terms and conditions referred to above, including exchange rate. This proposal was subject to a contract award by February 28, 1999.

26. On or about December 28, 1998, SALTS submitted a proposal to AMCOM for the "Royal Saudi Air Defense Forces PATRIOT Prime Power Sets" based on the Lechmotoren December 16, 1998 firm, fixed-price proposal. Page two of the proposal states: "Quantities for item 0010 are based on quantities indicated in Table 1 of the SOW, and on the subcontractor's proposal." SALTS disclosed to AMCOM that the conversion rate utilized in connection with payment to Lechmotoren was 1 US Dollar = 1.5 DM as noted above. For example, specific reference is made to this fact concerning Other Direct Costs ("ODC") included in the proposal.

27. On or about February 23, 1999, Lechmotoren submitted to SALTS another firm, fixed-price proposal. This proposal included the language quoted above and was made subject to contract award by June 30, 1999.

28. On or about August 10, 1999, Lechmotoren submitted to SALTS another firm, fixed-price proposal. This proposal also contained the above-quoted language and was made subject to contract award by September 30, 1999. The subcontractor's proposal was provided to the Government.

29. On or about September 14, 1999, an AMCOM Contracting Officer, Mr. Batts signed Deliver Order ("D.O.") 0004 to contract DAAH01-96-G-0001. Under D.O. 0004, SALTS agreed to provide generators and related services to the RSADF at a not-to-exceed price, but the final contract price was yet to be negotiated and definitized.

30. Because of the immediate need to acquire the solicited generators, at the request of the Government, and based upon the not-to-exceed price, SALTS began performance in September 1999.

31. A letter dated September 15, 1999 from the SALTS FMS Program Manager to the Lechmotoren Managing Director states: "SALTS wishes to express its appreciation to Lechmotoren for the patience and perseverance shown during the approximately two year period that the Prime Power (2nd Buy) has been in review and process."

32. The subcontract between Lechmotoren and SALTS, dated September 17, 1999, states at subparagraph 6.5: "All payments to be made to Lechmotoren under this Contract shall be made in U.S. Dollars or Deutsche Mark...." The not-to-exceed prices for the Contract Line Items are expressed in United States Dollars. The subcontract contains a provision that the referenced prices are based on an exchange rate of 1 US $ = 1.5 DM with the final exchange rate to be determined on the date of the actual prime contract award.

33. Throughout the fall and winter of 1999, SALTS continued its performance and accepted delivery of product and made payment to Lechmotoren in connection with the not-to-exceed subcontract which it had negotiated with Lechmotoren. The Lechmotoren not-to-exceed contract remained to be definitized, and payment by SALTS to Lechmotoren was conditioned upon a base exchange rate of 1 US $ = 1.5 DM. It could not be known at that time what the actual comparative value of the contract would be between US Dollars and Deutsche Marks. A

future adjustment of past payments by SALTS to Lechmotoren was a risk which SALTS assumed and continued to bear.

34. By letter dated September 28, 1999, to the Contracting Officer Gregory Wilson, SALTS provided the subcontractor proposal with Lechmotoren and requested that the Government conduct "a subcontract proposal audit to begin as soon as possible." SALTS informed the Government that Lechmotoren had not provided cost data to SALTS for the proposal but had committed to make their records available for review by an agency of the German government, the Bundesamt for Wehrtechnik, Koblenz, Germany. The U. S. Government conducted an audit of Lechmotoren through the Bundesamt fur Wehrtechnik (BWB), and received a written audit report from BWB.

35. SALTS submitted its proposal for the definitized contract on November 30, 1999. The Government and SALTS engaged in contract negotiations during the period of February 24 - 28, 2000. The Contract was priced in dollars. Travel costs to be included in the contract used the 1.5 DM=1US$ exchange rate.

36. During the negotiations, SALTS requested access to the audit report on Lechmotoren conducted by Bundesamt fur Wehrtechnik (the "Lechmotoren Audit") to facilitate the negotiation. The U.S. Government acknowledged that the audit had been conducted, but refused to provide a copy to SALTS. Nevertheless, the U.S. Government represented in the negotiations that the Lechmotoren Audit questioned 25% of the Lechmotoren proposal due at least in part to the prevailing DM to US $ exchange rate and the costs proposed in Dollars that were incurred or to be incurred in Deutsche Marks. The definitized contract was adjusted downward from the not-to-exceed price of $38,492,387 to the reduced firm, fixed-price of $36,570,187, with a signed certificate of current cost or pricing date, a downward adjustment of

$1,922,200, previously agreed upon based in part upon consideration of currency rate factors. The negotiations between SALTS and the Government included discussion of the fact that the Lechmotoren proposal in dollars was based on an exchange rate of $1=DM1.5 with a contingency that the exchange rate was subject to negotiations on date of contract award.

37. The definitized contract was based upon negotiations between the Government and SALTS including the exchange rate and actually awarded to SALTS on February 28, 2000, and signed by the Government representative on March 29, 2000.

38. Both the first buy and the second buy of generators were delivery orders to Government contract DAA H01-96-G-001.

39. On February 29, 2000, SALTS signed a Certificate of Currency Cost or Pricing Data.

40. In 2000, the exchange rate between the U.S. dollar and the Deutsche mark was a matter of public knowledge, and was published on a daily basis by a number of different sources. The Government has reliable sources from which it obtained the exchange rate.

41. The Defense Contract Audit Agency ("DCAA") normally uses DRI-WEFA to forecast exchange rates. Forecasts for exchange rates are readily available and easily accessible to the Government and, specifically, the Contracting Officer from various sources, for all of the periods of time in question for this case.

42. When SALTS paid Lechmotoren for deliverables under D.O. 0004, SALTS paid in Deutsche Marks and Euros.

43. Following completion of performance and payment under the contract, the DCAA undertook an audit of the contract. The fact finding was completed by March 2002. On March 27 and March 30, 2002, DCAA presented its basic findings to SALTS and SALTS responded by

noting its disagreement and bases therefore. An audit exit conference was held on or about April 25, 2002. SALTS communicated its fundamental disagreement with these findings in May 2002.

44. On or about September 19, 2002, the DCAA issued audit report no. 2191-2001S42000002 (the "Audit Report"), a copy of which is attached hereto as Exhibit 1. The report concludes, in part, that SALTS did not provide the most current cost or pricing data in regards to the actual exchange rate data it was incurring in purchasing the foreign currency to pay Lechmotoren, and recommended a subcontract cost adjustment of $5,054,953 directly related to this basis. It also recommended an additional price adjustment of $2,324,229 which results from applying overhead, G&A expense, and profit rates to what DCAA contended was an overstated amount proposed for the Lechmotoren subcontract price. The DCAA audit report erroneously uses as its audit base line the proposed costs submitted in SALTS' proposal dated November 30, 1999 of $38,492,387, rather than the actual, final negotiated firm, fixed-price of $36,570,187, thereby overstating its claimed loss by at least $1,922,200.

45. In a letter dated April 14, 2003 from Charles Johnson, an AMCOM contracting officer, to SALTS, Mr. Johnson stated that the DCAA Audit Report alleged SALTS furnished cost or pricing data that was not accurate, complete and current as of the date of agreement on price, and recommended that SALTS conduct an evaluation and provide findings and resolution of issues to his office no later than 7 May 2003.

46. SALTS requested a copy of the DCAA Audit Report in a letter dated April 28, 2003 to Charles Johnson. On May 07, 2003, a copy of the Audit Report was received by SALTS from Mr. Greg Wilson. In a letter dated June 04, 2003 to Charles Johnson, SALTS requested additional information which had not been provided to enable SALTS to provide a complete and well-informed response. The Government never provided the requested information.

47. In a letter dated March 14, 2007 (received by SALTS on April 8, 2007) from Tanya L. Davis, an AMCOM contracting officer to SALTS, Ms. Davis directed SALTS to "[t]ender a check in the amount of $10,506,076 payable to the Treasury of the United States."

48. Referring to DCAA Audit Report 2191-2001S42000002, Ms. Davis alleges "defective pricing" in her March 14, 2007 letter, but provides no reason or basis for this conclusion.

49. The Davis letter of March 14, 2007 states: "This is a final decision of the Contracting Officer." Prior to the issuance of this action, Ms. Davis did not communicate the bases or foundation for her decision and did not afford or permit SALTS any opportunity to be informed of her bases or to respond or provide information or data in connection with the decision or the process by which it was reached.

50. On or about June 02, 2007 SALTS responded to Ms. Davis' letter dated March 14, 2007. No substantive response was received by SALTS to any of its inquiries or attempts to gain information from Ms. Davis.

## DECLARATORY JUDGMENT
## NO FINAL DECISION

51. SALTS hereby incorporates by this reference paragraphs 1 through 50 as if fully set out herein.

52. The AMCOM contracting officer failed to take the steps necessary under applicable statutes and regulations to render a final decision. Specifically the contracting officers's final decision does not comply with 41 U.S.C. § 605(a) which states "[t]he final decision shall state the reasons for the decision reached." Moreover, the final decision did not comply with FAR § 33.211(a)(4)(iii) which required a "statement of the factual areas of agreement and disagreement."

53. SALTS seeks a declaration by this Court that the action of the contracting officer did not constitute a final decision, and as such, this matter should be dismissed and returned to AMCOM and the contracting officer to take those steps necessary to proceed to and issue a final decision.

## DECLARATORY JUDGMENT
## STATUTE OF LIMITATIONS

54. SALTS hereby incorporates by this reference paragraphs 1 through 53 as if fully set out herein.

55. The action by the Government in seeking to impose liability upon SALTS is barred by the applicable statute of limitations. The applicable statute of limitations is six (6) years. 41 U.S.C. § 605(a)

56. Under 41 U.S.C. § 605(a), the statute of limitations expires unless the contracting officer issues a final decision "within 6 years after the accrual of the claim."

57. FAR 33.201 defines "accrual of a claim as when all events that fix the alleged liability of either the Government or the contractor and permit assertion of the claim, were known or should have been known."

58. The Government ostensibly issued its final decision asserting its claim on March 14, 2007.

59. The Government knew, or should have known the basis for its claim on or before March 13, 2001.

60. SALTS respectfully requests that the Court enter final judgment declaring that the action of the Government is barred by the applicable statute of limitations.

## DECLARATORY JUDGMENT
## LACHES

61. SALTS hereby incorporates by this reference paragraphs 1 through 60 as if fully set out herein.

62. The Government has failed to proceed with reasonable diligence in reaching its conclusion and action by the Contracting Officer concluding that defective pricing has occurred. The contract in question was definitized on February 28, 2000 and completed on August 24, 2000. The DCAA audit which led to a determination of defective pricing was commenced on or about February 6, 2001, and basically completed its work and reached the conclusions expressed in its final audit report not later than March 2001. DCAA had concluded its audit and conducted its exit conference with SALTS on April 25, 2002. DCAA's final report, which did not vary in its conclusions from those expressed earlier in the audit process and during the exit conference, was issued on September 19, 2002.

63. The Government waited until at least March 14, 2007, to issue what it now purports to be its final decision. The Contracting Officer issuing the "final decision" states no bases for her conclusion that defective pricing had occurred. The conclusion also declares that interest will be assessed to the $10,506,076 claimed at the approximate rate of $1,536.56 per day.

64. The delay by the Government in issuing its final decision is unreasonable, causing injury to SALTS including, on information and belief, monetary damage, loss of

evidence, and changes of circumstances which now make it inequitable to permit the Government to pursue any claim against SALTS based upon the matters alleged herein.

65. As a result of the passage of time the parties and the Court will not have full and appropriate access to documents and international witnesses which are likely to have an impact on the resolution of this case. In light of the prejudice from the passage of time it would be unjust and inequitable for the final decision to be binding.

66. The Government's failure to act with reasonable diligence constitutes laches and inequitable conduct which will now work an inequity and injustice to SALTS and, consequently, acts as a bar to recovery by the Government in this case.

## DECLARATORY JUDGMENT
## NO DEFECTIVE PRICING

67. SALTS incorporates herein by this reference the allegations contained in paragraphs 1 through 66.

68. The Government bears the burden to prove that SALTS has engaged in defective pricing as a prerequisite to recovery of the sums which it has demanded from SALTS.

69. SALTS did not fail to disclose information which it had a duty to disclose to the Government in connection with its negotiations with the Government. The Government had at its disposal all information which SALTS is claimed to have any duty to disclose.

70.  In the negotiations between the Government and SALTS, adjustments were made to the proposed subcontract costs involving Lechmotoren which took into account exchange rate issues.

71.  Exchange rate issues were the subject, in part, of the audit of Lechmotoren conducted by or for the Government. The Contracting Officer refused to provide a copy of the audit or to disclose all of its details to SALTS, putting SALTS at a disadvantage in negotiations with both the Government and with Lechmotoren in definitizing the prime contract and the subcontract. SALTS reasonably believed that the Government had all information available to it at the time of the negotiations concerning which it now complains.

72.  SALTS fulfilled its obligation to provide current, accurate and complete information.

73.  The subcontract was subject to a potential adjustment to the final exchange rate after the definitization of the prime contract.

74.  SALTS is entitled to a judgment in its favor on all demands in the Contracting Officer's final decision of March 14, 2007.

## DECLARATORY JUDGMENT
## DEFENSE TO ALLEGED DEFECTIVE COST OR PRICING DATA-OFFSETS

75.  SALTS incorporates herein by this reference the allegations contained in paragraphs 1 through 74.

76.  Pursuant to 10 U.S.C. a (e)(4)(A) SALTS is entitled to off-sets to the amount claimed by the Government.

77. SALTS hereby asserts, and expressly reserves its right to further assert, claims against the Government which offset any claim to recovery from SALTS by the Government.

## BREACH OF IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING

78. SALTS incorporates herein by this reference the allegations contained in paragraphs 1 through 77.

79. The Government, through its agents, made representations to SALTS as to the content of the audit of Lechmotoren prepared by the BWB. On information and belief, the Government falsely represented that the BWB questioned 25% of the costs of the Lechmotoren proposal. The Government negotiator made statements which were false and misleading and/or failed to disclose information without the knowledge of which information revealed or discussed concerning the Lechmotoren audit was rendered false and misleading.

80. The Government failed to disclose material information from the Lechmotoren audit which it had a duty under the circumstances to disclose. SALTS specifically requested disclosure of the non-disclosed information. The Government's conduct in this regard breached its duty of good faith and fair dealing.

81. SALTS relied upon the representations and was damaged by the failures to disclose material facts, resulting in a reduction of the contract price.

82. SALTS was damaged as a direct consequence of these misrepresentations and failures to disclose, for which it seeks recovery as set forth below.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, SALTS requests this Honorable Court:

a. Declare and adjudge that the March 14, 2007 letter is not a final decision in the context of granting this Honorable Court jurisdiction because the Government, by failing to state the reasons for the decision reached, has not complied with 41 U.S.C. § 605(a.);

b. Declare and adjudge that the Government's demand for $10,506,076 in its March 14, 2007 letter is barred by the statute of limitations;

c. Declare and adjudge that, because of lack of diligence by the Government in pursuing its claim and the existence of prejudice to SALTS, the application of laches is applicable to bar the Government's claim against SALTS;

d. Declare and adjudge that SALTS has not engaged in defective pricing and that the Government is not entitled to the recovery of funds from or against SALTS as principal, interest or penalties;

e. Declare and adjudge that SALTS is entitled to off-sets in an amount in excess of any claim which the Government may have to payment from SALTS;

f. Award SALTS compensatory and consequential damages against the Government for damages suffered by SALTS as a result of the conduct of the Government, including, without limitation, damages resulting from the misrepresentations and failures to disclose of the Government; and,

g. Declare and adjudge that SALTS be granted or awarded such further and additional relief as to which it may show itself to be justly entitled.

Dated this the _____ day of March, 2008.

                                      Respectfully submitted,
                                      **ATTORNEY OF RECORD:**

                                      */s/ Roderic G. Steakley*

                                      **Roderic G. Steakley**
                                      **SIROTE & PERMUTT, P.C.**
                                      305 Church Street Suite 800
                                      P.O. Box 18248
                                      Huntsville, Alabama 35804-8248
                                      Telephone:   (256) 536-1711
                                      Facsimile:    (256) 518-3681
                                      Email:         rsteakley@sirote.com


                                      **OF COUNSEL:**
                                      **JEROME S. GABIG, JR.**
                                      515 Sparkman Drive
                                      Huntsville, Alabama 35816
                                      Telephone:   (256) 509-0279
                                      Facsimile:    (256) 704-6002
                                      Email:         gabig3@comcast.net